464 F.3d 297
CITY OF SYRACUSE, Syracuse Urban Renewal Agency, Defendants-Third-Party-Defendants-Appellants,v.ONONDAGA COUNTY and Onondaga County Department of Drainage and Sanitation, Defendants-Third-Party-Plaintiffs-Appellees,Atlantic States Legal Foundation, Inc., State of New York and Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation, Plaintiffs,2.3 Acres of Land in the City of Syracuse, NY, Defendant-Third-Party-Defendant.Docket No. 04-0718-cv.
United States Court of Appeals, Second Circuit.
Argued: September 14, 2004.
Decided: September 21, 2006.

Peter D. Carmen (David M. Garber, on the brief), MacKenzie Hughes LLP, Syracuse, NY, for Defendants-Third-Party-Defendants-Appellants.
Christina M. Pezzulo, (Anthony P. Rivizzigno, on the brief), Onondaga County Department of Law, Syracuse, NY, for Defendants-Third-Party-Plaintiffs-Appellees.
Before SACK, RAGGI and HALL, Circuit Judges.
HALL, Circuit Judge.

1
Almost twenty years ago, the Atlantic States Legal Foundation ("ASLF") initiated a Clean Water Act lawsuit against Onondaga County to force the County to clean up Onondaga Lake. The parties eventually signed an Amended Consent Judgment, which required the County to complete various sewer remediation projects in order to comply with state and federal law. The County proposed constructing one such facility on land owned by the City of Syracuse. Despite community opposition, the City administration appeared to support the project. At the last moment, however, the Syracuse Common Council voted against the property transfer. In an effort to prevent the derailment of the project, the County moved to join the City and the Syracuse Urban Renewal Agency ("City") as Third-Party Defendants in the ASLF lawsuit. The District Court granted the motion, and the County served its Third-Party Complaint, by which it sought to condemn the City property. In response to cross-motions for summary judgment, the District Court interpreted certain state laws and Onondaga County Administrative Code provisions concerning whether or not the approval of the Syracuse Common Council was required before the Commissioner of Drainage and Sanitation could condemn City land for sewer district purposes. The court entered judgment allowing the County to condemn the land without such approval. See Atl. States Legal Found. v. Onondaga County Dep't of Drainage & Sanitation, 233 F.Supp.2d 335 (N.D.N.Y. 2001). The City argues that not only was the District Court precluded from joining it as a party to the litigation, but also that the court erred in its interpretation of the state and county statutes at issue.

2
We affirm the District Court's joinder decision but, because of ambiguities in the statutory construction of New York State and Onondaga County law regarding which County entity or entities may condemn City land and the process they must follow, we certify questions relating to that issue to the New York Court of Appeals. We retain jurisdiction so that, upon receiving a response from the New York Court of Appeals, we may rule on this appeal.

BACKGROUND

3
In 1988, ASLF, a not-for-profit membership organization dedicated to protecting and restoring natural resources and preserving the environment, brought a citizen lawsuit under § 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365, against Onondaga County and the Onondaga County Department of Drainage and Sanitation ("County"). The ASLF alleged that the County had violated the Water Pollution Control Act and the New York State Environmental Conservation Law by discharging untreated raw sewage into Onondaga Lake from the County-owned and operated Metropolitan Syracuse Sewage Treatment Plant. The ASLF contended that, as a consequence of the discharges, Onondaga Lake did not meet the water quality standards authorized by the New York State Department of Environmental Conservation ("DEC"). New York State and the DEC later intervened as Plaintiffs in the lawsuit.

4
A. The Syracuse-Onondaga County Sewer System

5
Syracuse, the largest city in Onondaga County, is located at the southern end of Onondaga Lake. In 1907, Syracuse began constructing an extensive sewer system1 which, among other attributes, combined the collection of storm water and sewage in the same pipes. According to an Environmental Protection Agency Report, during heavy rainstorms or snow melts, the "already overloaded collection and treatment system is subjected to added stress" because the volume of water flowing through the system exceeds its hydraulic capacity. EPA Review of No Significant Impact and Environmental Assessment (July 16, 1999). In order to avoid sewage backup in basements during those periods of wet weather — which occur approximately fifty to sixty times per year — numerous Combined Sewer Overflow ("CSO") points located throughout the system would discharge raw sewage and storm water runoff into three Onondaga Lake tributaries. The sewage discharges impaired the water quality to such an extent that Onondaga Lake and its tributaries exhibited high bacteria levels. In addition, the EPA Report indicated that "the residents of the project area [were] subjected to the odors arising from the decomposition of the organic matter trapped in the CSOs and contained in discharges from the CSOs along Onondaga Creek during a storm event." Id.

6
Since at least the late 1970s, the County has made efforts to resolve the sewage discharge problem. A 1979 CSO control and abatement study examined several alternative technologies and, after considering capital and operating costs, environmental impact, and other factors, selected "collection and treatment in specific CSO drainage areas" as "the recommended CSO abatement master plan for the Syracuse metropolitan service area." Midland Ave. Reg'l Treatment Facility Alternative Site Evaluation Overview Document § 2.1 (Nov.1999). The Midland area in the City of Syracuse was selected as a site for CSO abatement because it was situated "at the general confluence of three major interceptor sewers in the County's combined system," in close proximity to the main interceptor sewer. Id. A 1991 update to the 1979 study suggested certain modifications to the 1979 program but did not change the Midland Avenue location as a sewer project site. The Midland Avenue Project ("Midland Project") was designed to decrease the discharge of raw sewage and untreated storm water into Onondaga Creek by constructing a Regional Treatment Facility. The City and the Syracuse Urban Renewal Agency ("SURA") owned the real property upon which the County sought to construct the Midland Project. The County's effort to condemn the Midland site became the subject of a third party action in the ASLF litigation and is the subject of the present appeal.

7
B. The Consent Judgment and the Amended Consent Judgment

8
The parties settled the ASLF lawsuit with a Judgment on Consent, signed on January 21, 1989, which established a timetable and schedule for bringing the discharges into compliance with pertinent statutes and regulations through completion of an upgrading project. The County agreed, inter alia, to devise and implement a Municipal Compliance Plan to improve the sewer system so that it did not run afoul of state and federal laws. The Consent Judgment also provided that the ASLF and DEC could seek various sanctions against the County for non-compliance with its terms. The County did not submit its proposed Municipal Compliance Plan and Draft Environmental Impact Statement until January 1996. This document summarized the results of the evaluations and proposed a cost-effective strategy for remediation of the water quality problems associated with the Syracuse Metro plant and CSOs. The ASLF and DEC determined that the County's proposed plan did not satisfy the requirements of the Consent Judgment.

9
Following negotiations, the parties agreed to and executed an Amended Consent Judgment ("Amended Judgment"), entered by the District Court on January 20, 1998. The Amended Judgment superseded the 1989 Consent Judgment and included the proposed improvement projects contained in the Municipal Compliance Plan along with several supplements and conditions. The Amended Judgment provided milestone compliance dates by which the County was to complete specific projects, and stipulated daily penalties for failure to comply with that schedule. The document contained numerous CSO abatement projects to be constructed by the County, including the Midland Avenue Regional Treatment Facility ("Midland RTF"). The Midland RTF, which the Amended Judgment situated near Oxford Street and Onondaga Creek, was envisioned as capturing overflows during heavy storms; storing the overflows on a short-term basis; removing, disinfecting, and storing the floatables and gross solids from those overflows; and eventually delivering the contaminants to the main interceptor sewer for treatment at the main Syracuse Metro plant, while discharging a small percentage of the disinfected water into Onondaga Creek.2 A 30,000 square foot aboveground building would be built to house the facility and equipment. Along with the below-ground disinfection tank, the Midland RTF would comprise approximately 78,750 square feet, or 1.8 acres. In addition, approximately 7,700 feet of new pipeline would be constructed to carry sewage and waste water to the Midland RTF. An engineering study anticipated that the facility — operating only during and after storm events — would provide substantial water quality benefits to Onondaga Lake. The total project cost was estimated at $75 million, with the EPA expected to contribute over $45 million.

C. City Participation in the Site Selection

10
The City and County disagree on the extent of City participation in the site selection for the Midland RTF. The City asserts that it did not participate in the Amended Judgment negotiations, and claims that its absence was the result of exclusion by the County. The County, for its part, responds that the City had been actively involved in the development of the Midland Project.

11
The City proffered an affidavit from ASLF President, Samuel Sage, in which Sage averred that, in 1997, he had been involved in "all negotiation sessions" among the parties to the litigation; he urged County representatives to bring the City into the negotiation sessions "to insure the successful and timely implementation of any negotiated settlement," particularly because the CSO components would be located in the City; and his efforts were "emphatically rejected." (Sage Aff. ¶¶ 4, 5, 7). The City also points to statements by the Onondaga County Executive and County Attorney, both before and after execution of the Amended Judgment, indicating that modification of the document was not an option.

12
While the City may have been excluded from the final Amended Judgment negotiations, the record reveals ample participation by City representatives in ongoing discussions concerning Onondaga Lake pollution. For example, during public hearings in 1993, hosted by the Onondaga Lake Management Conference ("OLMC"),3 the City announced that it was "dedicated to joining with the County and the other members of [the OLMC] to design the most effective cleanup possible at the least cost to the City taxpayers, the City and County taxpayers." OLMC Public Hearing at 10-11 (June 30, 1993). Countering Sage's affidavit, the County notes that, on August 6, 1997, the ASLF, County, U.S. Environmental Protection Agency ("EPA"), and City met to discuss the proposed Amended Judgment and the Midland Project. The County also points to the fact that, from 1998 to 2001, it held or participated in numerous public meetings with community members and City officials (from the Mayor's Office and Common Council) concerning the Midland Project. In December 1998, pursuant to the New York State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8-0101 et seq. (McKinney's 1997), and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the City consented to the County's designation as Lead Agency in the environmental review of the Midland Project. As part of that review, the County conducted a public hearing on the proposed Midland RTF in March 1999 — having provided notice of the hearing to City representatives — and heard from many Syracuse residents who expressed opposition to locating the plant in the Midland area. The County made available to the City a February 1999 Midland Facilities Plan which it had commissioned; a November 1998 Environmental Information Document concerning the Midland Project; and a November 1999 Alternate Site Evaluation analysis, in which the Midland site scored significantly higher than four other local sites. As part of the SEQRA/NEPA and funding approval process, the County forwarded these and other documents to the EPA, which issued a Finding of No Significant Impact and an Environmental Assessment on July 16, 1999. In September 1999, the City, as a member of the OLMC, voted to adopt a resolution approving and endorsing the Amended Judgment. In December 1999, the County solicited public comment, and Syracuse United Neighbors, a grassroots community organization, among others, responded with its concerns.

13
Also in December 1999, the EPA distributed a responsiveness summary and final Finding of No Significant Impact and approved a $45 million grant to fund the Midland Project. In response, ASLF, along with twenty-three organizations and individuals, filed suit in the Southern District of New York asserting that the EPA had wrongly determined that it was not required to prepare an Environmental Impact Statement before releasing federal funds for the Midland Project. The district court granted summary judgment to the EPA, a decision upheld on appeal. See Atl. States Legal Found., Inc. v. Browner, 2000 WL 1234659 (S.D.N.Y. Aug.31, 2000), aff'd sub nom. Atl. States Legal Found. Inc. v. Whitman, 14 Fed.Appx. 76 (2d Cir.2001).

14
In December 2000, the County held a public hearing to consider approval of and funding authorization for the Midland Project. The public hearing minutes reveal that residents of the neighborhood in which the Midland RTF was to be built expressed opposition, even outrage. The President of the Syracuse Onondaga NAACP termed the placement of the plant "environmental racism." Onondaga County Legislature Public Hearing Minutes at 457 (Dec. 4, 2000). Nevertheless, the County Legislature subsequently issued resolutions authorizing the construction of the Midland RTF project and bonds to fund it.

15
The City lands which the County sought to condemn were devoted to various public uses: a public street and right-of-way; low-income public housing (a nine-unit apartment building) operated by the Syracuse Housing Authority; and a public playground and green/open spaces for the adjacent low-income housing units.

16
In early 2001, the City Administration publicly announced that it supported the acquisition of the property needed for the Midland Project. At a February 2001 meeting, SURA voted to approve a Redevelopers Statement for Public Disclosure and to authorize publication for sale of the property upon which the Midland RTF would be built, designating the County as an eligible redeveloper for the Midland RTF site. In April 2001, the County submitted an Intermunicipal Agreement to the City, which included property purchase offers, a proposed takings map, a $3,000,000 mitigation plan for the Midland neighborhood, and a Neighborhood Redevelopment Initiative Plan. The City and SURA reviewed, negotiated, and ultimately accepted the County's proposal, and the City administration submitted the documents, along with appropriate legislation, to the Syracuse Common Council during the week of April 23, 2001, and recommended approval of the property transfer.

17
In May 2001, the Common Council considered the County's property transfer proposal, but withheld action until it could retain an engineering firm to compare the cost of sewer separation — an alternate sewer system technology — with the cost of the Midland Project. At a Common Council public hearing later that month, many area residents voiced their opposition to the sale of the City property. In August 2001, the engineering firm commissioned by the Common Council issued its report, which concluded that sewer separation would be neither a cost effective nor an environmentally viable alternative to the Midland RTF.4 Also during this time period, City residents contacted Common Council members and reiterated their opposition to the Midland Project.

18
On October 1, 2001, the County Legislature adopted Resolution 268 which authorized the County Executive to purchase the City/SURA properties. Also on October 1, the County Legislature, noting that the City had failed to approve the property transfers required for the County to comply with the ACJ, petitioned the Governor and the New York Legislature for state legislation amending Section 11.53(f) of the Onondaga County Administrative Code ("OCAC"), which the County at the time viewed as requiring Syracuse Common Council approval before Onondaga County could acquire by condemnation land owned by the City of Syracuse. The State never acted on this resolution.

19
On October 9, 2001, the Common Council finally considered the County's proposal to sell the properties and unanimously voted against the property transfers. It also rejected the proposed Intermunicipal Agreement.

PROCEDURAL HISTORY

20
Following the Common Council's rejection of its purchase offer, the County moved in November 2001 to join the City and SURA as Third-Party Defendants in what was by then the fourteen-year-old litigation. The County brought the joinder motion pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 19(a) of the Federal Rules of Civil Procedure, seeking an order: (1) joining the City and SURA as parties for the purpose of permitting the court to exercise its continuing jurisdiction to decide whether City and SURA-owned property could be condemned; (2) invoking the court's inherent equitable powers and powers under the All Writs Act to assume jurisdiction over the City; (3) suspending application of the limitation contained in OCAC § 11.53(f) with respect to condemnation of City-owned property requiring Common Council approval; (4) granting the County leave to commence a condemnation proceeding and granting its condemnation petition; (5) enjoining the parties from filing collateral proceedings; and (6) awarding costs and attorneys fees. The County served the motion on opposing counsel.

21
Due to the parties' confusion regarding the joinder procedure, the District Court issued an order dated December 7, 2001 directing the County to file and serve its joinder motion on the City/SURA and other parties, and directing the City/SURA to respond by raising objections to joinder but not discussing the merits of the action.

22
The County filed a second joinder motion in January 2002, seeking limited joinder of the City under Federal Rules of Civil Procedure 19(a) and 21, as well as the All Writs Act. The County claimed that limited joinder of the City was necessary to implement the terms of the Amended Judgment, and that without such joinder the parties could not obtain complete relief. The joinder motion emphasized the City's approval of, or lack of objection to, the Midland Project over the years, until the Common Council's October 2001 vote rejecting the property transfers, which imperiled implementation of the Amended Judgment's compliance plan. In this iteration of the joinder motion, the County dropped its earlier strategy of seeking to suspend application of OCAC § 11.53(f).

23
The City objected, charging that the County was attempting to condemn City land without Common Council consent, in violation of state law and the County administrative code. The City insisted that the County had excluded it from Amended Judgment negotiations and the County should not now be allowed to impose the terms of the Amended Judgment upon it for the purpose of condemning its lands, particularly because the County had had ample opportunity over the course of the fourteen year ASLF litigation to join the City. The City also contended that joinder was unnecessary under Rule 19(a) because complete relief could be afforded among the existing parties, given that City land was not required for construction of the Midland RTF (alternate sites had been considered), and because the DEC, already a plaintiff, could, through its own statutory authority, condemn City land, thus making the City's participation unnecessary.

24
Following oral argument in February 2002, the District Court rendered a decision from the bench. The court vented its frustration in having overseen the case for "many, many years" during which the Midland RTF project had been "stalled," stating "[t]he people in Onondaga County and the residents of the City of Syracuse deserve to have something done, especially since nobody is going to disagree, City, County or State, that the lake is a mess and it needs to be cleaned up and we have to do something about this . . . . I'm gonna get it over with today." Atl. States, No. 88-CV-66 (N.D.N.Y. Feb.11, 2002) (transcript at 24-25). The District Court then granted the joinder motion pursuant to Rule 19(a), explaining that "[m]uch of the property referenced in the plans pursuant to the consent decree is located in the City and is subject to the control of City entities. Thus, the County and the plaintiffs will need either City approval or City involvement in order to bring an effective outcome of this case." Id. at 27. The District Court found that the City would not be "greatly prejudiced by joinder" because it had been involved, "to a limited extent," in the ASLF litigation by participating in or having the opportunity to participate in discussions concerning the Amended Judgment's remedial measures, and because the County was not seeking to enforce the terms of the consent decree against the City. Id. The court further opined that the County was simply seeking to institute condemnation proceedings in the same court overseeing the consent decree rather than in state court where the parties might be subjected to "duplicative liability" and where "an inconsistent decision could result." Id. at 28. In addition, the District Court held that discretionary joinder under Rule 21 was appropriate because the City had "previously been cooperating with the County in finding a solution to the Onondaga Lake problem," but only after the City had discontinued its cooperation was its presence necessary and, consequently, there had been no unnecessary delay in joining the City. Id.

25
Finally, the District Court predicated joinder on the All Writs Act. Observing that "substantial money and effort has been expended to help develop the instant plan to attempt to clean up Onondaga Lake," and that, if joinder was not permitted, the parties would likely have to renegotiate the consent decree and expend even more time and money on litigation rather than cleanup, the court concluded that the exceptional remedy provided by the All Writs Act was appropriate. Id. at 29. The court again pointed out that the County was not seeking to enforce the terms of the consent decree against the City or hold the City as a non-party in contempt for violating those terms, nor was it seeking to circumvent the due process rights available to the City under the state's Eminent Domain Procedure Law ("EDPL"). Id. at 30-31.

26
The County then served on the City its third-party summons and complaint, along with a notice of condemnation and notice of pendency. In its complaint, the County asserted that the City's rejection of the County purchase offer had prevented the construction project contemplated by the Amended Judgment, and that the County was entitled to an order: (1) pursuant to the All Writs Act, assuming jurisdiction over a condemnation proceeding pursuant to the EDPL; (2) granting the taking of City and SURA property under the power of eminent domain; (3) holding that the March 1999, December 2000, and May 2001 public hearings, inter alia, satisfied the EDPL's public hearing requirements; and (4) providing the City either no compensation or just compensation for the taking. The complaint also sought a declaratory judgment declaring the County's right to seek such an order.

27
The City moved for summary judgment on the third-party complaint, contending that the County lacked authority to institute eminent domain proceedings. In arguments relevant to this appeal, the City asserted that condemnation was inappropriate because OCAC § 11.53(f) prohibited the County from condemning City land without Syracuse Common Council approval. It also contended that the Prior Public Use doctrine barred the County from condemning the property, as the Midland RTF would destroy the public uses to which the properties had been, and continued to be, devoted. The County opposed the motion and cross-moved for summary judgment, contending that it could condemn City property and that the properties were not being used for public purposes, given that the public street had been converted into a dead end and the apartment building was vacant and boarded up. On the issue of condemnation, the County argued that when the Commissioner of Drainage and Sanitation sought to condemn property, he needed Syracuse Common Council approval as required by OCAC § 11.53(f); however, when the County Legislature authorized the condemnation, no such approval was needed, and therefore the County could condemn the City land.

28
The District Court: (1) granted the County's motion for declaratory judgment; (2) denied the County's motion for summary judgment with leave to renew, pending service of proof of filing and publication on the City, along with a further motion for summary judgment; (3) denied the City's motion for summary judgment precluding condemnation; (4) granted the City's motion for compensation for the property; and (5) denied the County's motion for attorney's fees. See Atl. States, 233 F.Supp.2d at 348-49.

29
In denying the City's motion for summary judgment on the condemnation issue, the District Court generally adopted the County's reading of the State statutes and the County Administrative Code. The District Court reasoned that, pursuant to the relevant county and state law provisions, when the County Legislature, as opposed to the Commissioner of Drainage and Sewage, authorizes condemnation, Syracuse Common Council approval is not required. The court thus concluded that, in this case, the County was authorized to condemn the property at issue. Id. at 341-42.

30
The District Court similarly denied the City's motion for summary judgment on the issue of the Public Use Doctrine. The court concluded that, given the "significant disputes over whether the property has been abandoned, summary judgment is inappropriate." Atl. States, 233 F.Supp.2d at 342. However, it held that even if the City properties sought by the County were already devoted to public use and were not abandoned, the County's use of the land for sewage treatment purposes created a "greater public need," that the circumstances here were "special, unusual, or peculiar" so as to not warrant application of the public use doctrine, and that direct or implied legislative authority for condemnation existed. Id. at 342-43.

31
The County filed a renewed motion for summary judgment, as directed by the District Court. In a stipulation for entry of order of condemnation and final judgment, entered January 5, 2004, the City and County agreed, inter alia, to exchange statements of just compensation. On the same day, the District Court entered an order of condemnation for additional properties (the "additional properties" order), a Rule 54(b) order directing entry of judgment in the third-party action, and final judgment.

32
The City timely filed a notice of appeal, appealing from the joinder, declaratory judgment, condemnation, and additional properties orders, as well as the final judgment.

DISCUSSION

33
The City raises three arguments on appeal: (1) the District Court erred in joining it as a Third-Party Defendant; (2) the Syracuse Common Council did not adopt an ordinance consenting to the County's condemnation of city lands, and consequently the County is prohibited from condemning the City lands at issue; and (3) the District Court misapplied the Prior Public Use doctrine, which barred the County from condemning City lands.

34
We affirm the District Court's decision on the joinder issue. However, because the New York and Onondaga County laws at issue do not clearly answer the question of whether Onondaga County may condemn land within the City for sewer district purposes without obtaining approval from the City's Common Council, and because the construction of those laws has important ramifications for the City and County and implicates larger policy concerns, we certify five questions to the New York Court of Appeals.

I. Joinder

35
On appeal, the City challenges its joinder to the third party action on a number of fronts. It contends that the conditions for joinder under Fed.R.Civ.P. 19(a) and 21 are not satisfied,5 the District Court erred in joining the City under the All Writs Act, and that Fed.R.Civ.P. 14 does not permit joinder of third party defendants under the circumstances presented in this case.

A. Standard of Review

36
We review for abuse of discretion the District Court's decision under Rules 19 and 21 to join the City in the litigation. Jonesfilm v. Lion Gate Int'l, 299 F.3d 134, 139 (2d Cir.2002).

37
A district court "abuses" or "exceeds" the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions.

38
Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted); see also 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, Civil 3d § 1688 at 505, 507 (West 2001) ("The grant or denial of a motion to bring in or drop a party lies in the discretion of the judge . . . . The trial court's exercise of discretion will not be disturbed on appeal unless an abuse is shown."); cf. Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 612 (6th Cir.2003) (reviewing motion to drop misjoined party under Rule 21 for abuse of discretion). We also review joinder under the All Writs Act for abuse of discretion. United States v. Int'l Bhd. of Teamsters, 266 F.3d 45, 49 (2d Cir.2001).

39
B. Federal Rules of Civil Procedure 19(a) and 21

40
Rule 19, entitled "Joinder of Persons Needed for Just Adjudication" provides, in relevant part:

41
A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

42
Fed.R.Civ.P. 19(a). We have held that "[i]f the court determines that any of the criteria set forth in Rule 19(a) is met, then it must order that the absent person be joined as a party." Johnson v. Smithsonian Inst., 189 F.3d 180, 188 (2d Cir.1999).

43
Rule 21, entitled "Misjoinder and Non-Joinder of Parties," provides in relevant part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. Although Rule 21

44
contains no restrictions on when motions to add or drop parties must be made, the timing of the motion may influence the court's discretion in determining to grant it. Thus, the court typically will deny a request that comes so late in the litigation that it will delay the case or prejudice any of the parties to the action.

45
7 Wright, Miller & Kane, § 1688.1 at 510. Cf. In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 214 F.R.D. 152, 154 (S.D.N.Y.2003) (holding that District Courts have broad discretion to drop or add parties under Rule 21 "when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation" (quotation omitted)).

46
In its brief on appeal, the City asserts, in a heading, that "the conditions for joinder under Rules 19(a) and 21 are not satisfied." Appellants' Br. 30. Its argument, however, is devoted solely to the inappropriateness of joinder under Rule 19. In a footnote, the City contends that the District Court's reliance on Rule 21 was misplaced because that Rule is read in conjunction with Rules 19 or 20, and could not serve as an independent basis for joinder.6

47
"Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998). "Pursuant to this rule, we have held that an argument made only in a footnote was inadequately raised for appellate review." Id. Because the City touched upon its Rule 21 argument only in a heading and footnote in its brief, it has waived any challenge to joinder based upon this Rule.

48
The City contends that joinder is unnecessary under Rule 19(a)(1) because (i) complete relief may be accorded among those already parties, i.e., the DEC possesses the authority to exercise the power of eminent domain under New York law to condemn City/SURA land and convey it to the County, and (ii) City/SURA lands are not needed to implement the Amended Judgment. At the same time, the City acknowledges that the DEC has declined to exercise its condemnation authority over City/SURA property, despite repeated entreaties by the County to do so.

49
New York Environmental Conservation Law § 3-0305 provides the DEC Commissioner with statutory authority to "acquire any real property which he deems necessary for any of the purposes or functions of the department, by purchase or as provided in the eminent domain procedure law." Accordingly, the DEC, if it so desired, could have resolved the impasse by initiating condemnation proceedings against the City/SURA properties, thereby obviating the need for a third-party action. The DEC, however, chose not to do so. Upon learning that a New York State Assistant Attorney General was present at oral argument on this appeal, the panel invited him to explain why the State had not moved to acquire the City/SURA property. The Assistant Attorney General responded that the State had not taken a formal position in this "secondary litigation" because the State endeavors to act consistently with all of its counties and it did not want to act one way with one county and a different way with another county. City of Syracuse v. Onondaga County, No. 04-0718-cv (Oral Argument, Sept. 14, 2004).

50
In light of the State's position, the question becomes whether, under these circumstances, "complete relief" may be accorded among those already parties to this lawsuit. The answer is clearly no. Even before the Common Council's October 2001 refusal to transfer the land to Onondaga County, the State had refrained from exercising its condemnation authority, and it confirmed at oral argument that it would not exercise that authority in the future. Because complete relief cannot be accorded among those already parties, joinder of the City was necessary under Rule 19(a)(1) to accord the County complete relief.7

51
The City also points out that the Amended Judgment referenced only a general geographic area for the Midland RTF and that the County's November 1999 report revealed at least three other non-City/SURA sites for the facility. It contends that since the Midland RTF did not have to be sited on City/SURA-owned land, joinder was not necessary to accord the County complete relief. A joinder motion, however, is not an appropriate vehicle by which the City may revisit the County's decision made many years previously to reject alternative sites for the Midland RTF. The argument is simply not relevant to whether joinder under Rule 19(a) is proper. See generally Broadway Schenectady Entm't Inc. v. County of Schenectady, 288 A.D.2d 672, 673, 732 N.Y.S.2d 703, 704 (3d Dep't 2001) (refusing to annul County's determination to acquire property for use as a community police center despite petitioner's claim that the County had other available sites).

52
Furthermore, while the City asserts that it was prejudiced by joinder more than three years after the Amended Judgment was negotiated, these protests ring hollow. As the District Court found, the City had been "involved, to a limited extent in this litigation" and had "participated in or had an opportunity to participate in several discussions regarding the remedial measures to be implemented under the consent decree." Atl. States, No. 88-CV-66 (N.D.N.Y. Feb.11, 2002) (transcript at 27). City officials had maintained involvement in the CSO abatement project for years, and had communicated their approval. The need for joinder arose late in the process, and only at the point when the Common Council reversed the course the City had earlier signaled and rejected the transfer of property. Almost immediately the County sought to join the City to the lawsuit. The District Court did not err when it found that the City's previous involvement negated prejudice and that joinder had not been unduly delayed. The District Court thus did not abuse its discretion in joining the City under Rules 19(a) and 21.

53
C. Federal Rule of Civil Procedure 14; The All Writs Act

54
On appeal, the City also argues that the District Court erred by failing to analyze joinder under Rule 14, which governs third-party practice.8 The City did not raise its Rule 14 argument in the court below. This Court generally does not consider an argument raised for the first time on appeal. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). We decline the City's invitation here, having found joinder appropriate on other bases.

55
Finally, we need not reach the issue of joinder under the All Writs Act because we conclude that joinder was otherwise proper.

II. County Condemnation Power
A. Standard of Review

56
This Court reviews the grant of summary judgment de novo. Physicians Comm. for Responsible Med. v. Johnson, 436 F.3d 326, 331 (2d Cir.2006). "Specifically, because the district court's disposition `presents only a legal issue of statutory interpretation . . . [w]e review de novo whether the district court correctly interpreted the statute.'" Perry v. Dowling, 95 F.3d 231, 235 (2d Cir.1996) (quoting White v. Shalala, 7 F.3d 296, 299 (2d Cir.1993) (alteration in original)).

57
B. State Statutes and the Onondaga County Administrative Code

58
The arguments of the parties, the decision of the District Court, and the resolution of this appeal hinge on the interpretation of certain provisions of the Onondaga County Administrative Code, both in relation to each other and in relation to certain New York State statutes. Thus a review of the relevant statutes is useful to our discussion.

59
Against the backdrop of the City's and County's development of their respective sewer systems, and eventual consolidation, the State Legislature passed statutes and the County Legislature adopted an administrative code reflecting the evolution of Onondaga County's Sewer and Public Works Commission into a Sanitary District. In 1933, the New York State Legislature passed the Onondaga County Sanitary and Public Works Act ("Public Works Act"), Chapter 568, which created the Onondaga County Sewer and Public Works Commission. The statute provided, inter alia, that the Commission of Public Works could acquire lands by condemnation, with title taken in the name of the County. This provision generally remained unchanged until 1952, when the State Legislature granted the Commission the power

60
[t]o acquire, in the name of the county, by purchase or gift, or condemnation, lease or other means, real property or rights or easements therein, or other property, necessary or convenient for its purposes to acquire, in the name of the county by condemnation real property or rights or easements therein necessary for its purposes including but not limited to the real or other property of a municipal corporation.

61
Onondaga County Public Works Act, 1952 N.Y. Laws, ch. 815, § 8 (footnotes omitted, emphasis added).

62
In 1953, the State Legislature passed Chapter 855, which again amended the Onondaga Public Works Act. Chapter 855 incorporated numerous protections that specifically benefitted the City of Syracuse. Particularly important to this appeal, the Legislature removed the Commission's authority to condemn land, including "the real or other property of a municipal corporation," conferred by the 1952 amendments and, in its place, substituted the following: "no such real property or rights or easements therein of the city of Syracuse may be acquired by condemnation without the consent and approval of the common council of the city by ordinance duly adopted." Onondaga County Public Works Act, 1953 N.Y. Laws, ch. 855, § 5.

63
In addition to the above amendment to section 5, the 1953 amendments also amended § 6 of the Onondaga County Public Works Act. As amended, § 6 required that "[w]henever [a] report includes a proposed district or extension or the acquisition or construction of a sewer or sewers and/or plants, treatment plant or plants or public works within, serving or including any portion of the city of Syracuse, a copy thereof shall be filed with the common council of the city." Id. at § 6. Section 6 provided that, if the Board of Supervisors tentatively approved a project, a public hearing was required. After the hearing, the Board was authorized to approve or disapprove a proposed project. Section 6 further mandated that the Board could not "approve or establish or extend any sewer district [or] plan . . . within or serving the city of Syracuse," or reduce or diminish the size of any sewers in Syracuse or abandon or discontinue any of the same sewers, without "first having obtained the consent thereto of the city of Syracuse by its common council by ordinance." Id.

64
In the early 1960's, Onondaga County became a charter county under New York law and adopted its own administrative code, the OCAC. Among other things, the County Charter and the OCAC provided for a County Executive and County Legislature rather than a Board of Supervisors and replaced the Commission with the Commissioner of the Sewer District. Of particular relevance to this appeal, the Onondaga County Charter repealed the Onondaga Public Works Act. Article 11-A of the OCAC (§§ 11.50-11.82), however, incorporated chapter 568 of the laws of 1933, as amended. The OCAC set out the powers and duties of the Commissioner of Drainage and Sanitation (formerly the Commissioner of Public Works), which had "each and every power and duty in relation to county facilities . . . as was heretofore given to the Onondaga public works commission." OCAC § 11.50(a). The OCAC spelled out the Commissioner's role as follows:

65
To have jurisdiction, control, possession, and supervision of existing sewer systems and projects heretofore established . . . and all such sewers, plants and projects hereafter established . . . and to make alterations, additions, improvements, betterments and extensions thereto, and have all the rights, privileges and jurisdictions necessary or proper for carrying such power into execution. Provided, however, that nothing in this paragraph is intended to nor shall it be construed in any way to supersede the powers herein specifically granted to the county legislature or the city of Syracuse.

66
OCAC § 11.53(e). The next OCAC subsection, § 11.53(f), imported, almost word-for-word, the provision from the 1953 amendments to the Public Works Act concerning the Commissioner's power to acquire property. Section 11.53(f) permitted the Commissioner

67
(f) To acquire in the name of the county, . . . by condemnation, real property . . . including but not limited to such property of a municipal corporation. Provided . . . no such real property or rights or easements therein of the City of Syracuse may be acquired by condemnation without the consent and approval of the common council of the city by ordinance duly adopted.

68
(emphasis added).9

69
OCAC § 11.54, entitled "Establishment," similarly tracks the Public Works Act of 1953. Like § 6 of the Act, OCAC § 11.54 provides that whenever the commissioner's report involves a proposal relating to the City of Syracuse, a copy of the report must be filed with the Syracuse Common Council. The County Legislature considers the commissioner's report, and tentatively approves or disapproves of the plan. If the County Legislature tentatively approves the plan, it must a hold a public hearing. At or after such hearing, the County Legislature "may adopt a resolution approving the [project] . . . . Provided however, that no such construction shall be undertaken without such final approval of the county legislature." Notably, unlike § 6 of the Act, OCAC § 11.54 does not state that the County Legislature is required to obtain consent of the City of Syracuse before it can establish or extend any sewer district or plan, improvement, extension or project or construct or acquire a sewer or sewers and/or plants or treatment plants or other public works within or serving the City of Syracuse.

70
In 1974, the New York Legislature passed Chapter 955, which again amended the Onondaga County Public Works Act. This latest amendment established the Onondaga County Sanitary District as a successor to the then-existing Sanitary and Treatment Plant Districts. The OCAC incorporated all of the provisions of Chapter 955 as OCAC § 11.82. OCAC § 11.82 set forth the procedure by which the County Legislature could dissolve the existing sanitary and treatment plant districts and establish the new county-wide sanitary district. Sections 11.82(g) and (i), upon which the County relies in its argument on appeal, provide:

71
(g) After the establishment of the Onondaga county sanitary district, the county legislature may authorize an increase, improvement or reconstruction of the facilities of such district, including the acquisition of additional lands or interests in land therefor in the manner provided in section 11.5510 of this article.

72
* * *

73
(i) To the extent not inconsistent with this section, all of the provisions of this article relating to a sanitary district established pursuant to section 11.5411 of this article shall apply to the Onondaga county sanitary district.

74
OCAC §§ 11.82(g), (i) (emphasis added).

75
Apart from the laws that pertain solely to the Onondaga County sewer district, the New York State Legislature has enacted statutes, found in various sections of the consolidated laws, that generally grant counties authority to acquire real property by condemnation. New York Gen. Mun. Law § 74, entitled "Condemnation of real property," provides that "[a] municipal corporation authorized by law to take and hold real property for the uses and purposes of the corporation, may, if it is unable to agree with the owners for the purchase thereof, acquire title to such property by condemnation." A municipal corporation is defined in N.Y. Gen. Mun. Law § 2 to include "a county, town, city and village." In addition, N.Y. County Law § 215, entitled "County property; general provisions" provides that a board of supervisors may condemn real property for lawful county purposes. N.Y. County Law § 215(3). Finally, N.Y. County Law § 263, codified under Article 5-A, "County Water, Sewer, Drainage and Refuse Districts," provides that the administrative head or body of a Sewer District may condemn real estate that may be necessary for sewer district purposes.

76
C. Statutory Construction: Which County Entity/Entities May Condemn City Land?

77
Before the District Court, the City argued that OCAC § 11.53 governs and, pursuant to § 11.53, the County is required to obtain approval from the Syracuse City Council before any condemnation may proceed. The County countered that the limitation in OCAC § 11.53 applies only to the Commissioner and that the County is able to condemn City property without limitation pursuant to N.Y. Gen. Mun. Law § 74 and N.Y. County Law § 215(3).

78
The District Court rejected the City's argument, concluding that § 11.53(f)'s City Council approval requirement applies only to the Commissioner, not to the County. In so ruling, the District Court observed that the interpretation suggested by the City "would render the separate definitions given for `Commissioner' and `County' in § 11.51 of the [OCAC] meaningless." Atl. States, 233 F.Supp.2d at 341. The court further noted that "requiring Common Council approval for the condemnation here would conflict with OCAC §§ 11.82(g) and (i)." Id. Specifically, the court concluded that because OCAC § 11.82(g) authorizes the County Legislature to acquire land without limitation — a dispensation separate from and supplemental to the power given to the Commissioner — the County Legislature is not encumbered by the restriction in § 11.53(f) requiring Syracuse Common Council approval in order to condemn City land. To the extent that § 11.53 purports to limit the authority of the County Legislature to acquire City property pursuant to § 11.82(g), the District Court held that § 11.53(f) is inconsistent with and conflicts with § 11. 82, if § 11.53(f) was read to apply to the County Legislature. Id. Finally, the court noted that such a construction was reasonable in light of the New York State County Law, which allows condemnation by the administrative head of a sewer district. See id. (citing N.Y. County Law § 263). Accordingly, the court concluded that "[t]he OCAC restricts the right of the Commissioner, as an employee of an administrative unit of the County, from acting independently to condemn property within the City of Syracuse without the authorization of the City Common Council," but it does not require the County to seek City Council approval. Id. at 341-42.

79
On appeal, the City contends that the District Court erred in concluding that the County does not need Syracuse Common Council approval for condemnation. The crux of the City's argument is that the District Court incorrectly presumed that the Commissioner has his own condemnation authority separate from the County's condemnation authority. The City maintains that "[t]he commissioner has no independent authority of condemnation — he may only act through the County — and any separation of, or distinction between, condemnation authority of the commissioner and the County is incorrect as a matter of law." Appellants' Br. 44. The County argues that the Commissioner's condemnation authority is a permissive additional grant of authority, not a limitation on the County Legislature's power to condemn. The County thus contends that the requirement of City Council approval set forth in OCAC § 11.53(f) applies only to the Commissioner. We find merit in both parties' arguments.

80
As discussed above, various sections of the New York State Consolidated Laws permit governmental entities to condemn real property. General Municipal Law § 74 allows any "municipal corporation" to acquire property by condemnation "for the purposes of the corporation"; County Law § 215(3) allows the county Board of Supervisors (the County Legislature) to acquire land by condemnation for county purposes; and County Law § 263 permits the administrative head of the sewer district to acquire land by condemnation for purposes of the district.12 However, New York case law holds that where a county, such as Onondaga, "has adopted its own form of government, the provisions of that county's duly adopted local laws apply instead of those of the County Law," unless the County Law explicitly indicates that its provisions control. Long Island Liquid Waste Ass'n, Inc. v. Cass, 115 A.D.2d 710, 711, 496 N.Y.S.2d 527, 529 (2d Dep't 1985). See N.Y. County Law § 2 (any conflicts between, or limitations of, the provisions of New York County Law and any local law or administrative code shall be decided in favor of the local law or administrative code). See also Inc. Vill. of Nyack v. Daytop Vill., Inc., 78 N.Y.2d 500, 505-08, 577 N.Y.S.2d 215, 217-19, 583 N.E.2d 928 (1991) (discussing New York Municipal Home Rule Law § 10(1)(i), which gives counties the power to enact local laws in a wide range of matters relating to local concern, as long as the local legislation is not inconsistent with the State Constitution or with any general law of the State).

81
Section 11.53 (f) of the OCAC provides that the Commissioner may not condemn City property without first obtaining Common Council approval. Further, § 11.54 of the OCAC requires the Commissioner to gain approval of the County Legislature. These provisions conflict with County Law § 263, which allows the administrative head (in this case, the Commissioner of the Sewer District) to condemn property, including City property, without limitation.13 Because these laws conflict, and County Law § 263 contains no express indication that it should control, OCAC § 11.53(f) governs the analysis.

82
Section 11.53(f) clearly limits the power of the Commissioner to condemn City land for sewer district purposes. Whether that section also limits the power of the County to condemn City land for sewer district purposes, however, is less clear. The OCAC defines "County" and "Commissioner" as two separate terms. See OCAC § 11.51. Section 11.53(f) (which is listed under the heading of "powers and duties" of the Commissioner), does not mention the County. Thus, on the one hand, because § 11.53 does not specifically reference the County's authority to condemn property, and the City points to no provision that would extend to the County § 11.53's limitation on the Commissioner's power to condemn land, it might be possible to construe the limitations on condemnation embodied in § 11.53(f) to apply only to the Commissioner. Nowhere in the OCAC does it state that the procedures set forth provide the exclusive means by which land may be condemned for sewer district purposes in Onondaga County. Nor is there a provision explicitly requiring the County to act through the Commissioner. Further, OCAC §§ 11.53(f) and 11.54 may reasonably be read to provide that when the Commissioner, rather than the County, initiates condemnation proceedings involving City land, more safeguards, including both Common Council and County Legislature approval, are required. This interpretation is supported by the fact that § 11.54, unlike Chapter 855 § 5 of the now-defunct Onondaga Public Works Act,14 does not require the County to obtain Common Council approval before making any final determination regarding the establishment or extension of any sewage project within or serving Syracuse. Under this construction, the County could condemn City property pursuant to County Law § 215(3) or Municipal Law § 74, or both.

83
On the other hand, the OCAC might be construed to provide the exclusive mechanism for condemning land for sewer district purposes in Onondaga County. Under this scenario, the provisions of the OCAC supersede the County and Municipal laws. This interpretation finds support in § 11.54 of the OCAC, which sets forth the condemnation process and provides specific roles for the Commissioner, the County Executive, and the County Legislature. In pertinent part, § 11.54 provides that the Commissioner, acting on behalf of the County, creates maps and plans and decides which land should be condemned for sewer district purposes. Once the Commissioner makes such a decision, he is required to elicit the approval of the County Executive and present his recommendation to the County Legislature for its final determination. Under this scheme, the County acts through the Commissioner, and because the authority of the Commissioner to condemn land within the City is limited — pursuant to the plain terms of the OCAC — the authority of the County to condemn City land is necessarily limited as well. See, e.g., Haas v. Nickerson, 27 A.D.2d 842, 278 N.Y.S.2d 255 (2d Dep't 1967), aff'd 21 N.Y.2d 902, 289 N.Y.S.2d 622, 236 N.E.2d 855 (1968) (holding that local law precluded county from condemning land within village except with approval of Village Board of Trustees).

84
In addition, the County argues that Chapter 955, which became OCAC § 11.82, repealed all of the prior provisions of Article 11-A to the extent those provisions were inconsistent with § 11. 82, and to the extent that § 11.53(f) limited the Legislature's acquisition of property, it is inconsistent with and superseded by § 11.82(g) pursuant to § 11.82(i). The County also asserts that both the history and language of that legislation reaffirm the County's unlimited condemnation authority, given Congress's dissatisfaction with a multi-district system as indicated in the legislative history of the Clean Water Act and the language of § 11.82(g), which contains no limitation on the authority to acquire property. As an alternative, the County posits that §§ 11.53(f) and 11.82(g) might be harmonized to give effect to each provision: the former expressing the limited powers of the Commissioner, and the latter expressing the unlimited power of the County Legislature.

85
The City counters that § 11.82(g) merely allows the County to acquire additional land for sewer district purposes. Moreover, the City argues that the New York Court of Appeals has held that repeal of a statute similar to § 11.53(f) exempting specific property from condemnation requires "clear legislative language." Soc'y of the N.Y. Hosp. v. Johnson, 5 N.Y.2d 102, 108, 180 N.Y.S.2d 287, 291, 154 N.E.2d 550 (1958). The City asserts that § 11.82(i) does not come close to meeting that standard. Even if §§ 11.53(f) and 11.82(g) were ambiguous when read together, the City posits that these sections must be interpreted against a construction that would permit condemnation, because condemnation authority must be clearly delegated. In addition, § 11.82(g) makes no mention of condemnation as a means by which the County Legislature may authorize the acquisition of additional lands, a significant omission because "[s]tatutes conferring the power of eminent domain are not extended by inference or implication." Schulman v. People, 10 N.Y.2d 249, 255, 219 N.Y.S.2d 241, 243, 176 N.E.2d 817 (1961).

86
While we find the County's argument on this point unpersuasive, we nevertheless note that OCAC § 11.82 is susceptible to different interpretations. Thus, all told, the state laws and OCAC provisions governing condemnation are susceptible to conflicting interpretations, the outcome of which determines the resolution of this case.

III. Prior Public Use Doctrine

87
In addition to arguing that § 11.53(f) prohibits the County from condemning the property at issue, the City also contends that the Prior Public Use doctrine bars the County from condemning the property. The District Court rejected the City's argument.

The Prior Public Use doctrine holds that:

88
[A] general grant of power to condemn property does not extend to property already acquired for or devoted to a public use (Matter of Central Hudson Gas & Elec. Corp. v. Morgenthau, 234 A.D. 530, 532-33, 256 N.Y.S. 97, aff'd. 259 N.Y. 569, 182 N.E. 184). The general rule is that property already devoted to public use can only be condemned by special legislative authority clearly expressed or necessarily implied (New York Cent. & H.R.R.R. Co. v. City of Buffalo, 200 N.Y. 113, 117, 93 N.E. 520).

89
Buffalo Sewer Auth. v. Town of Cheektowaga, 20 N.Y.2d 47, 52-53, 281 N.Y.S.2d 326, 331, 228 N.E.2d 386 (1967). There are certain narrow exceptions to this doctrine. Lands already acquired for public use "should not be taken for another public use unless the reasons therefor are special, unusual and peculiar." N.Y. Cent. & H.R.R.R. Co., 200 N.Y. at 117, 93 N.E. 520. Also, "land devoted to a public use may be condemned for another public use only if the new use would not materially interfere with the initial use." Matter of Village of Middleburgh, 120 A.D.2d 830, 831, 502 N.Y.S.2d 109, 109-10 (3d Dep't 1986).

90
The District Court found that, given the "significant disputes over whether the property has been abandoned," summary judgment was inappropriate. Atl. States, 233 F.Supp.2d at 342. However, it held as a matter of law that even if the City properties sought by the County were already devoted to public use and were not abandoned, the County's use of the land for sewage treatment purposes created a "greater public need" because such use would impede further sewage discharge into the lake. Id. The court then held that the circumstances here were "special, unusual and peculiar" and that the legislature had showed "an express or implied intention that the land should be taken." Id. at 342-43 (quoting Matter of City of Rochester v. Rochester Gas & Elec. Corp., 54 Misc.2d 855, 856, 283 N.Y.S.2d 631, 632 (N.Y.Sup.1967)). The District Court opined that the City's change in position from support of the program to opposition after the plans had been completed weighed in favor of finding special or unusual circumstances, where forcing the County and State to "start over at this late date would work a significant hardship on them and the taxpayers." Id. at 343.

91
The District Court next held that "Congress's indication that the general water pollution control issue is of great concern," together with the State laws charging the County with maintaining sewage treatment for the County, the County resolutions indicating the County's desire to comply with the Amended Consent Judgment, and the OCAC provisions authorizing the County to condemn land for sewer district purposes, satisfied the requirement that there be implied or express legislative authority for the condemnation. Id.

92
On appeal, the City claims that the Prior Public Use doctrine prevents the County from condemning City property, given that the land was devoted to public use (streets, low income housing, green space, playground); that the County's plans would interfere with that current use; and that no state legislative authority existed to prove that the County had the statutory authority to condemn. The City adds that the District Court erred both by not holding a factual hearing to determine whether the circumstances surrounding condemnation for the Midland RTF were sufficiently "special, unusual and peculiar" to overcome any prior public use and also by relying on dicta in Town of Riga to hold that the Prior Public Use doctrine did not apply. In response, the County echoes the holdings of the District Court, stating that the last-minute refusal by the City to sell the property to the County, constituted "special, unusual and peculiar" circumstances. The County also asserts that the City's argument that the District Court should have held a hearing on the issue of prior public use was raised for the first time on appeal; that the properties were not currently used for public purposes; and that legislative authority existed for condemnation.

93
IV. Certification to the New York Court of Appeals

94
Rule § 0.27 of the Rules of the Second Circuit provides: "Where authorized by state law, this Court may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court."

95
"Certification is to be used in those cases where there is a split of authority on the issue, where a statute's plain language does not indicate the answer, or when presented with a complex question of New York common law for which no New York authority can be found." DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir.2005).

96
[I]n determining whether to certify a question, our Court considers, inter alia, three main issues: (1) "the absence of authoritative state court interpretations of the state statute," Green v. Montgomery, 219 F.3d 52, 60 (2d Cir.2000); (2) "the importance of the issue to the state," id., and whether the question implicates issues of state public policy, see Home Ins. Co. v. Am. Home Prods. Corp., 873 F.2d 520, 522 (2d Cir.1989); and (3) "the capacity of certification to resolve the litigation." Green, 219 F.3d at 60.

97
Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 531 (2d Cir.2006). In this case, we conclude that these considerations warrant certification to the New York Court of Appeals.

98
A. The Absence of Authoritative State Court Interpretations of the Statutes and The Importance of the Issues to the State

99
It may come as no surprise that no state court has interpreted the condemnation powers set out in Chapters 855 and 955, as incorporated into the OCAC, as this is an exceedingly narrow question that applies to statutes that in turn apply solely to Onondaga County. Moreover, although various principles of New York condemnation law are well-settled, no state precedent directly addresses the question presented in this case concerning the relative powers of the County and the City in condemning land within the City limits.

100
While the answer to the specific question of which County entity may condemn City land may bear only upon the facts of this case, the larger state law questions involving the distribution of condemnation power between two state-created entities implicates important legal and policy questions that we believe are best resolved in the first instance by the New York Court of Appeals. Cf. Sealed v. Sealed, 332 F.3d 51, 59 (2d Cir.2003) (observing that "[w]here a question of statutory interpretation implicates the weighing of policy concerns, principles of comity and federalism strongly support certification"); Israel v. State Farm Mut. Auto. Ins. Co., 239 F.3d 127, 135 (2d Cir.2000) (noting that issue affected state interests and observing that, in absence of dispositive precedent on issue, state had "a strong interest in deciding the issue[s] certified rather than having the only precedent on point be that of the federal court, which may be mistaken" (alteration in original)). For example, in Carney v. Philippone, 332 F.3d 163 (2d Cir.2003), this Court certified questions regarding the Onondaga County Tax Act to the New York Court of Appeals, explaining that apparent inconsistencies in relevant provisions of the Act, which were not elucidated by the smattering of cases discussing the Act, presented circumstances where certification was necessary. See id. at 172. A similar situation presents itself here and warrants certification.

101
B. Is the Issue/Are the Issues Dispositive?

102
The resolution of the various issues in this case determines the outcome of this appeal. If the New York Court of Appeals adopts a statutory construction that holds that both the Commissioner and the County Legislature can condemn land for sewer district purposes, then we would affirm the District Court's grant of summary judgment to the County. If the Court of Appeals holds that only the Commissioner of Drainage and Sanitation has the authority to condemn City land for County sewer district purposes, then Common Council approval for condemnation was required, and the District Court's resolution of the third-party action in the County's favor would have to be reversed. Moreover, if the New York Court of Appeals holds that the District Court properly interpreted the state statutes and OCAC provisions, allowing the County to condemn the land, resolution of the appeal would then depend upon the merits of the City's argument that the Prior Public Use doctrine precluded a grant of summary judgment to the County. If the New York Court of Appeals arrives at that juncture, we would again benefit from its guidance as to whether the Prior Public Use doctrine applies in this case, and we therefore have posed two questions in that regard.

CONCLUSION

103
For the reasons set forth above, we affirm the holding of the District Court that joinder of the City and the Syracuse Urban Renewal Agency was appropriate. We conclude, however, that unsettled and significant issues of state law are central to this case, and they involve important policy considerations. Accordingly, pursuant to Second Circuit Local Rule § 0.27 and New York Court of Appeals Rule § 500.17, 22 N.Y.C.R.R. § 500.17, we respectfully certify the following questions to the New York Court of Appeals:

104
• Does the County have authority, independent from the authority of the Commissioner of the Sewer District, to determine which land may be condemned for sewer district purposes in Onondaga County?

105
• If the County has authority to decide which property may be condemned for sewer district purposes, does § 11.53(f) of the Onondaga County Administrative Code ("OCAC"), which requires Common Council approval before the Commissioner may condemn land within City limits, extend to the County?

106
• To the extent the Common Council approval requirement of § 11.53(f) extends to the County, is that requirement inconsistent with or superseded by § 11.82(g), which provides that the County Legislature may "authorize the acquisition of additional lands"?

107
If the Court of Appeals decides that the County does indeed have authority to condemn the land in question15, we would respectfully ask it to address the Prior Public Use doctrine, as follows:

108
• Are the circumstances of the condemnation "special, unusual and peculiar" under New York law, so that the condemnation falls within one of the narrow exceptions to the public use doctrine?

109
• If the Court finds that the condemnation is "special, unusual or peculiar," do the provisions of the OCAC authorizing the County to condemn land for use in the sewer district, see OCAC § 11.82(g), and County Resolution No. 268 (which allocated funds for the purchase of the condemned properties), express sufficient legislative intent to allow condemnation of the land in this case?

110
We invite the New York Court of Appeals to reformulate these questions in any way that it sees fit. In articulating the questions as we have, we do not intend to limit the scope of the New York Court of Appeals' analysis or its response. The certified questions may be deemed expanded to cover any pertinent further issue that the Court of Appeals thinks it appropriate to address.

111
It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York State Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that court declines certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.

CERTIFICATE

112
The following questions are hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and 22 N.Y.C.R.R. § 500.27, as ordered by the Court of Appeals of the Second Circuit:

113
1. Does the County have authority, independent from the authority of the Commissioner of the Sewer District, to determine which land may be condemned for sewer district purposes in Onondaga County?

114
2. If the County has authority to decide which property may be condemned for sewer district purposes, does § 11.53(f) of the Onondaga County Administrative Code ("OCAC"), which requires Common Council approval before the Commissioner may condemn land within City limits, extend to the County?

115
3. To the extent the Common Council approval requirement of § 11.53(f) extends to the County, is that requirement inconsistent with or superseded by § 11.82(g), which provides that the County Legislature may "authorize the acquisition of additional lands"?

116
4. Are the circumstances of the condemnation "special, unusual and peculiar" under New York law, so that the condemnation falls within one of the narrow exceptions to the public use doctrine?

117
5. If the Court finds that the condemnation is "special, unusual or peculiar," do the provisions of the OCAC authorizing the County to condemn land for use in the sewer district, see OCAC § 11.82(g), and County Resolution No. 268 (which allocated funds for the purchase of the condemned properties), express sufficient legislative intent to allow condemnation of the land in this case?

Notes:

1
The Director of the Onondaga Lake Improvement Project Office described the system as consisting of "dedicated sanitary sewer laterals and collectors, storm water collecting sewers, combined sewers and catchbasins that collect sanitary wastewater and/or storm water. . . . This combined flow is conveyed to trunk and interceptor sewers within the City, owned, operated and maintained" by the County

2
A report on the Midland Avenue Redevelopment Initiative described the operation of the Midland RTF as follows:
Once reaching the RTF, the combined sewage and storm water would flow through a screening device that would remove large solids. After screening, the water is pumped to swirl concentrators — devices that use centrifugal force to separate `settleable' particles and floatables from the water.
The water then is disinfected using liquid sodium hypochlorite to kill bacteria, viruses and other pathogens found in the combined sewage. Because chlorine solutions are toxic to fish and other organisms, the water then goes through a process called `dechlorination.' Liquid sodium metabisulfite would be added to the water to `deactivate' the chlorine — making it safe for discharge into Onondaga Creek, which after flowing through downtown Syracuse, enters Onondaga Lake.
Approximately 90 percent of the total flow generated from annual precipitation will be captured by the system for conveyance to Metro for treatment. Of the remaining 10 percent, approximately 9.5 percent will be treated and discharged to Onondaga Creek from the RTF.

3
The Onondaga Lake Management Conference is an inter-governmental body designed to address water quality issues in Onondaga Lake. The City, County, State, Army Corps of Engineers and Environmental Protection Agency are members

4
This finding echoed a 1998 engineering evaluation, conducted pursuant to the Amended Judgment, which concluded that sewer separation in the Midland RTF drainage area was not "a cost-effective alternative to consolidation of these drainage areas." Environmental Engineering Assocs. Sewer Separation Evaluation Mem. at 4 (Oct. 15, 1998)

5
During oral argument on the joinder motion, Judge McAvoy twice misspoke when he enumerated the Federal Rules under which the County had moved for, and he had granted, joinder. He stated: "The County moves for joinder based on Federal Rule[s of] Civil Procedure 19, 20, 21 and the All Writs Act, 28 USC Section 1651," and "[T]he Court finds the All Writs Act, used in combination with Rule 20 and 21, provides a basis for this Court to exercise jurisdiction over the condemnation proceedings." However, the County had never moved nor argued for joinder on the basis of Rule 20. The court's ruling from the bench on the joinder motion concerned only Rules 19 and 21 and the All Writs Act. On appeal, the County argues that joinder is appropriate under Rule 20, which allows permissive joinder of defendants
if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.
Fed.R.Civ.P. 20(a). Because the County raises this argument for the first time on appeal, we will not consider it. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

6
This is a curious statement because the District Court granted joinder under Rule 21 in conjunction with Rule 19

7
Having determined that the requirements of Rule 19(a)(1) are satisfied, this Court need not address the arguments proffered concerning joinder under Rule 19(a)(2), given that the requirements of the Rule are set forth in the disjunctiveSee Johnson, 189 F.3d at 188 ("If the court determines that any of the criteria set forth in Rule 19(a) is met, then it must order that the absent person be joined as a party.").

8
Rule 14, entitled "Third-Party Practice," provides,inter alia, "[a]t any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed.R.Civ.P. 14(a).

9
Even though the OCAC incorporated the Onondaga Public Works Act of 1933, as amended, it did not include all of the protections afforded the City of Syracuse as provided in the 1953 amendments (Chapter 855). However, the OCAC did incorporate as § 11.53(f) the provision from Chapter 855 that required Common Council approval before the Commissioner could condemn City property

10
OCAC § 11. 55, entitled "Additions to Sewer System," describes the procedure that the Commissioner must follow — once the sanitary district is established — to add additional sewer lines or treatment plants. The Commissioner must prepare maps, plans, and cost estimates, as well as indicate whether any private property would be benefitted by such construction. Once the Commissioner gains the approval of the County Executive, he then reports his maps and plans to the County Legislature for their approval or disapproval of the project. Prior to making its final determination, the County Legislature is required to hold a public hearing

11
OCAC § 11.54, entitled "Establishment," describes the procedure that the Commissioner must follow to "hear all persons interested in the establishment of the proposed district," or the extension and acquisition of sewers. If the Commissioner determines that the establishment or extension of the district is in the public interest, he has to first seek approval of the County Executive and then report his recommendation to the County Legislature. If the extension included land in the City of Syracuse, the Commissioner's report had to be filed with the Syracuse Common Council. The County Legislature would then consider the report, hold a public hearing, make changes, and adopt a resolution approving the establishment or extension, and authorizing construction

12
Although a specific statute takes precedence over a more general statute when the statutes conflict,see Greene v. United States, 79 F.3d 1348, 1355 (2d Cir.1996) ("When two statutes are in conflict, that statute which addresses the matter in specific terms controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim."); Williamson v. 16 West 57th St. Co., 256 A.D.2d 507, 510, 683 N.Y.S.2d 548, 551 (2d Dep't 1998) (same); see also Cook v. New York State Div. of Parole, 321 F.3d 274, 279 n. 4 (2d Cir.2003) (observing that a well-established rule of statutory construction provides that "a general provision should not be applied when doing so would undermine limitations created by a more specific provision"), it is not apparent that County Law § 215(3) and § 263 conflict. Section 263 provides that the administrative head may acquire land by condemnation for the "purposes of the district"; it does not, however, clearly state that the administrative head is the only governmental body or administrative agent that may acquire land by condemnation for district purposes. Nor does § 263 generally impose limitations on the administrative head's condemnation authority, such that applying § 215(3) would necessarily undermine § 263. On the one hand, we might construe the more specific County Law § 263, permitting the administrative head of a sewer district to acquire land by condemnation, as taking precedence over County Law § 215(3), which generally permits the county legislature to acquire land. On the other hand, it may be possible to conclude that, under County Law, both the county and the administrative head of the district have authority to condemn land for sewer district purposes.

13
The City contends, as it did before the District Court, that although County Law § 263 does not explicitly require the administrative head to gain approval of the county legislature first before condemning land, the Commissioner is, in fact, required to gain such approval. In support of its contention, the City cites the Third Department's decision inTom Sawyer Motor Inns, Inc. v. Chemung County Sewer Dist. No. 1, 33 A.D.2d 720, 305 N.Y.S.2d 408 (3d Dep't 1969), in which the court held that sewer districts are merely administrative units of county governments. The City's argument is unpersuasive.
As the District Court observed, although Tom Sawyer held that the function of the sewer district is solely an administrative one, it did so in the context of restricting plaintiffs from suing the sewer district as a separate entity, reasoning that all of its actions were answerable by the county. See Atl. States, 233 F.Supp.2d at 341, n. 6. Notably, Tom Sawyer did not discuss how such a classification affected the sewer district's powers and duties. Further, as the District Court also noted, for certain powers of the administrative heads of the district, approval by the legislative body is explicitly required by statute. See id. at n. 7; see, e.g., N.Y. County Law § 263 (requiring approval of legislative body before administrative head of water district may enter into certain contracts).

14
Section 5 of Chapter 855 (which the State Legislature passed in 1953, amending the Onondaga Public Works Act) contains language that became OCAC § 11.53(f)

15
If the New York Court of Appeals decides that the County does not have the authority to condemn City land without Common Council approval, the Court would not have to reach the questions concerning the Prior Public Use doctrine since a finding for the City on the condemnation issue would be dispositive of the appeal